## IN THE COURT OF APPEALS OF IOWA

No. 20-0049
Filed June 17, 2020

IN RE THE MARRIAGE OF MATTHEW J. MEYER
AND CARRIE R. MEYER

Upon the Petition of
MATTHEW J. MEYER,
        Petitioner-Appellant,

And Concerning
CARRIE R. MEYER,
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Johnson County, Lars G. Anderson,

Judge.


        The father appeals the custody determination and visitation schedule in this

dissolution case. **AFFIRMED AS MODIFIED.**


        Matthew J. Adam and Rae M. Kinkead of Simmons Perrine Moyer Bergman

PLC, Cedar Rapids, for appellant.

        Carrie Meyer, Richville, Minnesota, self-represented appellee.


        Considered by Tabor, P.J., and May and Greer, JJ.

**GREER, Judge.**

Believing he should be the physical care parent, Matthew Meyer appeals the district court decision awarding the mother, Carrie Meyer, physical care of their one child. Alternatively, Matthew argues that if Carrie is granted physical care, the child's best interests require affording him additional visitation. Matthew also requests that Carrie pay the costs of the appeal. Carrie files no responsive brief.[1]

## I. Background Facts and Proceedings.

Carrie and Matthew met in May 2013. The relationship led to their marriage on July 1, 2014. Carrie, along with her two children[2] from her previous marriage moved into the Solon, Iowa home Matthew bought. After the move in 2014, Carrie and Matthew's child, C.J.M., was born in October of that same year. The parties raised the child in Solon, where Matthew still resides, until the marriage failed. The parties separated in January 2017 after Matthew assaulted Carrie.[3] After that, all communication about the child occurred by text messaging between the parties. Matthew moved in with his mother, Joette Meyer. Carrie remained in the family home until March 2018, when the home was sold at a sheriff's sale in foreclosure proceedings. Then Carrie moved in with relatives in Minnesota who had offered to help her. The child will begin kindergarten the fall of 2020.

---

[1] Carrie did file a statement waiving a brief. *See* Iowa R. App. P. 6.903(3) ("The appellee shall file a brief or a statement waiving the appellee's brief.").

[2] Both children are older, one was eighteen years old and the other was in high school, and moved from the Meyer home to their father's home in 2016, before these proceedings.

[3] Matthew was charged with domestic abuse assault and operating while intoxicated (OWI). He pled guilty to the assault charge and the OWI was dismissed. Because he successfully completed the plea terms, his deferred judgment of assault was expunged.

To set the stage for our discussion, Matthew continues to reside in his mother's home in Solon. Matthew described a strong relationship between him and the child that included close contact with her grandmother, who provided day care for the child while Matthew worked. Matthew emphasized his involvement in the community and his church and his long-standing stable employment heading the commercial division of a heating and air-conditioning company. Matthew earns around sixty thousand dollars annually.

Before and during the marriage, Carrie worked for Conagra Foods making over sixty thousand dollars annually until she was laid off in the fall of 2016. While she has a master's degree in business administration, Carrie was no longer employed at the time of trial and had not had a part-time or full-time job for over three years. Carrie described her role as primary caretaker of the child since Matthew left the home in January 2017 and even before he left. She described a close relationship with the child that also included strong connections with the older step-siblings.

Both parents were actively involved with the care of the child during the first two years of the child's life when both parents were working full-time and living in the same home. Matthew assumed the role of cook and grocery shopper and Carrie handled more of the medical appointments for the child. But after the no-contact domestic abuse order prevented contact between Carrie and Matthew, fifteen months went by with what Matthew described as limited contact with the child. Matthew asserted Carrie limited his contact with the child to only times where she wanted to go somewhere or when she needed something from him. Yet

Matthew did not initiate any formal efforts to seek additional time with the child during those fifteen months.

Finally, Matthew filed to terminate the marriage in February 2018 and to seek physical care or shared care of the child. According to Matthew, the main sources of friction were the cleanliness of the home and Carrie's inability to find another job and financial deficiencies. Money was tight, Carrie's vehicle was repossessed, and the house foreclosed. Carrie's assessment of the marriage failure focused on her concern for her safety. She cites Matthew's aggression towards her, their poor communication, and Matthew's drug and alcohol addictions as primary concerns. And while Matthew downplayed the domestic assault incident, he did plead guilty and did successfully complete the terms of his plea.

It was not until March 2018 that a temporary custody order established physical care in Carrie with Matthew exercising regular visitation every other weekend, plus a Wednesday overnight each week. Then in March 2019, once the home was foreclosed, Carrie moved more than seven hours away to a town in Minnesota. Matthew requested temporary custody and to hold Carrie in contempt of the previous temporary custody order. While the district court did not find Carrie in contempt, it did modify the schedule in May 2019 to allow Matthew visitation with the child one-week per month. Although the child was in good physical health, the parents used an Iowa therapist for counseling with the child related to coping with the divorce for a few months in the summer of 2019.[4]

---

[4] After discharge in September 2019 because of lack of engagement, the counselor recommended continuation of therapy wherever the child resided. Counseling has not resumed.

With custody as the central issue, the dissolution went to trial in October 2019.  The child was five years old at the time of trial, Matthew was thirty-eight and Carrie was forty-three.   After a two-day trial, the district court entered a December 23, 2019 decree awarding the parties joint legal custody with physical care of the child in Carrie, "[b]ased primarily on the fact that Carrie has been the undisputed primary caretaker."  Because there is more than a seven-hour travel distance between the parties' homes, visitation for Matthew was limited to one weekend per month to be exercised in Minnesota, seven consecutive weeks in the summer, and extra time during school winter and spring breaks.  After considering Matthew's post-trial motion, the court ordered an additional summer visitation week if the summer school break is twelve weeks or longer.  The court also added a Thanksgiving visitation from Wednesday to Sunday in odd numbered years and mandated phone contact every Tuesday and Saturday night over and above communication encouraged by the district court.  Matthew appealed.

## II.  Standard of Review.

Marriage dissolution proceedings are equitable in nature.   Iowa Code § 598.3 (2018).  Thus, our review is de novo.  *See* Iowa R. App. P. 6.907; *Wilker v. Wilker*, 630 N.W.2d 590, 594 (Iowa 2001).  We review the entire record and decide anew the factual and legal issues preserved and presented for review.  *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998).  Although we give weight to the district court's findings of fact, we are not bound by them. *See In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015).  Even so, we will affirm the district court unless it failed to do equity.  *See In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

### III. Custody Determination.

When physical care is at issue, our primary consideration is the best interests of the child. *See* Iowa R. App. P. 6.904(3)(o). Our objective "is to place the child[ ] in the environment most likely to bring [the child] to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). We review "a nonexclusive list of factors to be considered when determining whether a joint physical care arrangement is in the best interests of the child." *In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007).

> The factors are (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*Id.* (quoting *Hansen*, 733 N.W.2d at 697–99); *see also Hensch v. Mysak*, 902 N.W.2d 822, 824–25 (Iowa Ct. App. 2017) (same). When determining who will have physical care of the child, we will consider "stability and continuity with an eye toward providing the child[ ] with the best environment possible for [the child's] continued development and growth." *Hansen*, 733 N.W.2d at 700. "[T]he factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* Carrie has approximation and continuity on her side, and Matthew has stability in his corner.

We respect that "[t]he trial court has the advantage of hearing the evidence and observing the witnesses." *In re Marriage of Brainard*, 523 N.W.2d 611, 614 (Iowa Ct. App. 1994). But we look to which parent will do better in raising the child

into a healthy, content, and well-adjusted young adult. *See In re Marriage of Rodgers*, 470 N.W.2d 43, 44 (Iowa Ct. App. 1991). On that end, the district court weighed several concerns about each parent:

> The Court does have concerns about Matthew and Carrie. On Matthew's end, they include:
> • He did plead guilty to OWI and domestic abuse of Carrie. He appears to minimize what happened.
> • He clearly is angry with Carrie.
> • He appears to have said things to or in front of C.J.M. about Carrie that he should not have.
>
> On Carrie's end, they include:
> • Her living conditions appear to have at times left something to be desired.
> • She also appears to have said things to or in front of C.J.M. about Matthew that she should not have.
> • She was not credible about why she has not sought or obtained work, and this failure has contributed to her financial instability.

The district court emphasized that the deciding factor is "the history of care, which supports awarding physical care to Carrie." No one testified that the child did anything but thrive under Carrie's care. "[S]uccessful caregiving by one spouse in the past is a strong predictor that future care of the child[ ] will be of the same quality." *Hansen*, 733 N.W.2d at 697. Although Matt blames Carrie for keeping the child away from him after the no-contact order issued, he created that situation. And he failed to formally seek more visitation time or contact for those fifteen months. From January 2017 until trial in October 2019, Carrie was the day-to-day caretaker of the child. And Carrie argued that she assumed that role after her job layoff in 2016 until trial as well. So her history of successful caregiving is a strong predictor of the quality of her future care. *See In re Marriage of Walton*, 577 N.W.2d 869, 871 (Iowa Ct. App. 1998).

But there are other factors to weigh, and we too have concerns to address in making this custody decision. We note that Matthew is favored if stability of the physical home is a consideration. "[P]reservation of the greatest amount of stability possible is a desirable goal." *Hansen*, 733 N.W.2d at 696–97. Although Carrie has a master's degree, she remains unemployed and, since the filing of the divorce decree, has failed to position herself and the child in a stable long-term housing situation. With regard to Matthew, his mother cares for the child and he has many family members in the community. In contrast, even at trial, it was unclear whether Carrie would remain in Minnesota, return to Iowa, or relocate again—this time to Arizona to be near her parents. The instability of her finances and the home weigh against Carrie.

Likewise, Carrie's failure to inform Matthew about her move to Minnesota until after she left the state is concerning. *See Johnson v. DeJoode*, No. 08-0378, 2008 WL 5412114, at *3 (Iowa Ct. App. Dec. 31, 2008) (recognizing the mother provided early caretaking responsibilities, the court awarded custody to the father and cited the importance of communication between parents that is required to promote child's well-being). Even so, the district court noted the move was not for the purpose of depriving Matthew of contact with their child. At trial Carrie urged the court to award her sole custody, citing the past abuse from two years earlier. And Carrie suggested she could live closer to Matthew if he would fund expenses, stating, "[O]therwise we are northern bound." Hopefully, the parties now look forward and communicate with the best interests of the child in mind avoiding power plays on either side.

While minimal changes in the physical environment of the child could promote emotional stability, which favors Matthew, we note "our case law places greater importance on the stability of the relationship between the child and the primary caregiver over the physical setting of the child." *Williams*, 589 N.W.2d at 762; s*ee also In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa Ct. App. 1995). Carrie served as the physical care parent since early 2017 and successfully supported the child financially, socially, and emotionally in spite of the conflict between the parents and her lack of employment. And even after moving to Minnesota in March 2019, no trial testimony revealed the child was not thriving in the new environment. The care history supports an award of physical care in Carrie and we anticipate stability in Carrie's living situation and finances will materialize, enabling Carrie to bring the child to healthy physical, mental, and social maturity. In the end, these parents remain focused on the best interests of the child and we hope that effort continues even given the distance between the parental homes. Finally, a child will fare better if parents are communicating. *See In re Holub*, 584 N.W.2d 731, 733 (Iowa Ct. App. 1998) (noting that successful parenting involves setting aside petty differences to act in the child's best interest). Therefore, we affirm the district court custody decision, noting it had the benefit of observing and evaluating these parents' live, in-court testimony.

## IV. Visitation.

Because we affirm the physical care determination, Matthew asks us to consider increasing the parameters of his visitation. "A noncustodial parent should be awarded liberal visitation in order to afford the child[ ] the opportunity to maximize continuing physical and emotional contact with both parents." *In re*

*Marriage of Farrell*, 481 N.W.2d 528, 531 (Iowa Ct. App. 1991). "Although liberal visitation is the benchmark, our governing consideration in defining visitation rights is the best interests of the children, not those of the parent seeking visitation." *Brainard*, 523 N.W.2d at 615. With the distance between homes involving a more than seven-hour drive, the district court was challenged to craft a liberal schedule.

Overall we agree with the district court's visitation ruling with two exceptions. First, we modify the decree to accommodate Matthew's request for every other weekend visitation in or near the vicinity where the child resides. Next, we modify the order to offer Matthew the extended Memorial Day and Labor Day weekends.

**V. Request for Payment of Costs.**

Matthew requested that we require Carrie to pay the costs associated with this appeal. Costs shall be shared equally between the parties.

**VI. Conclusion.**

We affirm the district court decision on the physical care issue, modify the visitation provisions, and require Matthew and Carrie to split equally the costs of this appeal.

**AFFIRMED AS MODIFIED.**